# Illinois Official Reports

## Appellate Court

*Baker v. Department of Employment Security*, 2014 IL App (1st) 123669

| | |
|---|---|
| Appellate Court Caption | RONALD BAKER, Plaintiff-Appellant, v. THE DEPARTMENT OF EMPLOYMENT SECURITY; THE DIRECTOR OF EMPLOYMENT SECURITY; THE DEPARTMENT OF EMPLOYMENT SECURITY BOARD OF REVIEW; and CHICAGO PARK DISTRICT, c/o Cambridge/Sedgwick, Bruce Kijewski, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-3669 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | February 24, 2014<br><br>March 13, 2014<br>March 14, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The denial of plaintiff's application for unemployment benefits by the Board of Review of the Department of Employment Security following the termination of his employment for making aggressive or hostile comments during meetings with other workers, including supervisors, was properly upheld on administrative review, since plaintiff made comments about "going Arizona" shortly after a shooting in Arizona in which several people, including a Congresswoman, were shot and some died, and the Board's conclusion that defendant's comments constituted misconduct under the Unemployment Insurance Act was not clearly erroneous. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-50928; the Hon. Robert Lopez Cepero, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | David A. Rodriguez, of DePaul Legal Clinic, of Chicago, for appellant. |
|---|---|
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Janon E. Fabiano, Assistant Attorney General, of counsel), for appellees. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. Justices McBride and Palmer concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff Ronald Baker appeals from an order of the circuit court of Cook County affirming the ruling of the Board of Review (Board) of the Illinois Department of Employment Security (IDES) which denied him unemployment benefits. On appeal, plaintiff contends that his statement in the presence of three supervisors did not constitute a threat or misconduct. He also asserts the circuit court abused its discretion in denying his request to remand the matter to the Board to consider a supervisor's affidavit as additional evidence. We uphold the Board's decision.

¶ 2    Plaintiff was employed as an electrician for the Chicago Park District (District) from August 1997 to February 28, 2011, when he was discharged for violating the District's code of conduct with respect to violence in the workplace. Under that policy, employees are prohibited from making aggressive or hostile comments, threatening remarks, or any activity or gesture that creates a reasonable fear of injury to another person or subjects another person to emotional distress. The District's disciplinary meeting disposition, over the signature of human resources manager Pamela Walton, informed plaintiff of his termination and stated in pertinent part:

> "It has been reported that on 1/20/11 during a meeting in the office with your foreman regarding a previous conversation you had with a co-worker (two other foremen were in the office at the time of the meeting) you were heard making the following allegation[,] 'I don't want this to turn into an Arizona thing,' and directed the comment to each of the foremen present."[1]

¶ 3    Following his termination, plaintiff applied for unemployment insurance benefits. A claims adjudicator determined plaintiff was ineligible for benefits after finding he had been discharged for misconduct connected with his work. Plaintiff appealed for reconsideration of his claim, and a telephone hearing was scheduled before a referee on April 28, 2011.

---

[1]Plaintiff's alleged "Arizona" comment referred to a shooting incident in Arizona less than two weeks earlier, on January 8, 2011, when a United States Congresswoman and 18 others were shot, 6 of them fatally.

¶ 4        The hearing participants, placed under oath, were: plaintiff; Pamela Walton, a human resources manager for the District who prepared the disciplinary meeting disposition; Arturo Alvarez, plaintiff's foreman; and Faye Scales, employer representative. At the onset of the hearing, the referee asked plaintiff if there were any other witnesses he had arranged for the referee to call that day. Plaintiff replied there were none.

¶ 5        Pamela Walton testified that the District had a "violence in the workplace" policy which was set out in a handbook, that employees receive a copy of the handbook summary, and that plaintiff had received training in regard to the policy. Walton stated that plaintiff had been issued prior warnings in January, May and August of 2009 "for the same thing," "[b]eing disrespectful and impolite and also the offense of violating the workplace violence." As to the instant matter, plaintiff violated the District's "violence in the workplace" policy in an incident on January 19, 2011. At a subsequent corrective action meeting, plaintiff told Walton that during the incident he had said, "No one's about to go Arizona." He told Walton that the term he used was not derogatory, was taken out of context, and he meant it in a joking way, not meaning that he was going to "turn or do Arizona."

¶ 6        Arturo Alvarez, a District foreman, testified that he was plaintiff's supervisor. On the day of the incident, Alvarez was speaking with another worker, Frank, when plaintiff insinuated himself into their conversation and began making comments about Frank's mother. When plaintiff and Frank exchanged words, Alvarez told them to stop and pulled plaintiff into the office. Two other supervisors, Jack Bruno and Jack Kiley, were also in the office at that time. During a conversation about the incident with Frank, plaintiff told Alvarez "that he was going to do an Arizona." "But what he said was that he'd *** go Arizona on us and then *** he mentioned my name" and the names of Bruno, Kiley, and a third supervisor. When the referee asked Alvarez what he thought plaintiff meant, Alvarez replied: "Well, what he was meaning was he was mad and he's probably come and shoot us." Plaintiff was referring to shootings in Arizona and threatening to "cause bodily harm on us." The referee asked Alvarez whether he felt threatened and he responded: "Uh, well, it was a threat, yes. *** Uh, in a way when my name was mentioned, yes." Neither plaintiff nor Alvarez was raising his voice. Alvarez did not know whether plaintiff was angry. When asked whether plaintiff's voice was raised, Alvarez replied, "Uh, no. But I've been threatened before with lower voices than that." Alvarez had not had previous confrontations with plaintiff, but other supervisors had.

¶ 7        Alvarez and the other supervisors reported the incident to human resources. The other supervisors were upset and wanted to file a police report. Alvarez, Bruno and Kiley went to the police station to make an incident report. The referee asked Alvarez whose idea that was, and Alvarez replied: "Well, it was all of our idea." The police report was filed on the morning of the incident.

¶ 8        Plaintiff testified that after the incident between him and Frank, Alvarez pulled plaintiff over in front of the office. When Alvarez told plaintiff "over and over again" that plaintiff was wrong to talk about Frank's mother like that, plaintiff replied: "Art[,] you know ain't nobody trying to go Arizona." Alvarez asked plaintiff to come into the office to talk about it. Plaintiff noticed that two other foremen, Bruno and Kiley, were in the office. Plaintiff told Alvarez he was not supposed to go in the office alone without a witness "because I'm always getting in trouble when I go in there." Plaintiff entered the office with Alvarez, who admonished him again about his comments concerning Frank's mother. Alvarez "kept saying out his own

mouth if it was him, he wouldn't be able to handle it because you know his mother is passed. *** And I was like Art ain't nobody trying to go Arizona. *** I don't even know why that word came out. But that's what it meant. It meant for him to calm down. *** There were [*sic*] no arguing. No one was yelling. I mean it was just a normal conversation. And I told him to calm down. Ain't nobody trying to go Arizona."

¶ 9    Plaintiff testified that foreman Jack Bruno was in the room and told plaintiff later that he did not feel threatened. Plaintiff had submitted to the referee a written statement ostensibly from Jack Bruno and asked the referee whether the statement was being admitted as evidence. The referee responded that she had admitted the statement but would not give it very much weight because it was not signed, dated, or notarized. Plaintiff did not know whether Bruno was one of the persons who filed a police report. He did not even know there was a police report until a week before the hearing when the police came and talked to him.

¶ 10    On April 29, 2011, the referee issued her decision, which included these findings of fact:

"The claimant worked as an Electrician. On 01/19/2011 he got into an argument with a co-worker. He was called into the Supervisor's office to discuss it. Two other supervisors were present. The Supervisor told him not to talk about the co-worker's mother in an argument. The claimant then told the Supervisor that he might 'go Arizona' on the Supervisors. They took the reference to the Arizona killings as a threat and filed a police report. The claimant was discharged for violation of the employer's violence in the workplace policy."

¶ 11    The referee affirmed the determination of the local office denying benefits after determining that the employer proved by a preponderance of the evidence that plaintiff was discharged for violation of the violence in the workplace policy. Plaintiff admitted that the term "go Arizona" meant killings in Arizona, and his testimony that he only said, "Ain't nobody trying to go Arizona" and that it was not a threat, was not credible. The supervisors felt threatened and filed a police report. The referee concluded that plaintiff was discharged due to misconduct as defined in section 602(A) of the Unemployment Insurance Act (Act) (820 ILCS 405/602(A) (West 2010)) and was subject to disqualification of benefits under that section.

¶ 12    Plaintiff appealed to the Board. On July 19, 2011, the Board affirmed the referee's decision and found that the further taking of evidence was unnecessary.

¶ 13    Plaintiff sought administrative review of the Board's decision. Appended to his memorandum in support of his petition for administrative review was an exhibit entitled "Affidavit of Jack Bruno," an unnotarized verified statement in which Bruno stated that: at no time during the incident did he feel threatened; after the incident, general foreman Jack Campesi wanted foremen Bruno, Alvarez, and Kiley to say that plaintiff threatened them; Campesi and Kiley wanted to contact the police, but Alvarez and Bruno did not; and Bruno went to the police station but did not sign his name "because I did not believe that Mr. Baker threatened anyone." Bruno was afraid to say anything in detail before he retired in July 2011, but since then he feared no retaliation from the District.

¶ 14    Defendants filed a motion to strike Bruno's statement and portions of plaintiff's memorandum. The circuit court granted defendants' motion to strike the statement. On December 6, 2012, the circuit court affirmed the decision of the Board. Plaintiff now appeals from the judgment of the circuit court.

¶ 15        In an appeal from an administrative review proceeding, this court reviews the decision of the Board rather than that of the circuit court. *Phistry v. Department of Employment Security*, 405 Ill. App. 3d 604, 607 (2010). "The question of whether an employee was properly terminated for misconduct in connection with his work involves a mixed question of law and fact, to which we apply the clearly erroneous standard of review." *Hurst v. Department of Employment Security*, 393 Ill. App. 3d 323, 327 (2009). Misconduct is defined as (1) a deliberate and willful violation of (2) a reasonable rule or policy (3) that harms the employer or other employees or has been repeated by the former employee despite a warning or the employer's explicit instructions. *Phistry*, 405 Ill. App. 3d at 607. An employee willfully violates a work rule or policy when he is aware of and consciously disregards that rule. *Odie v. Department of Employment Security*, 377 Ill. App. 3d 710, 713 (2007). In administrative review cases, the hearing officer functions as the fact finder, determines witness credibility and the weight to be given their statements, and draws reasonable inferences from the evidence. *Young-Gibson v. Board of Education of the City of Chicago*, 2011 IL App (1st) 103804, ¶ 56. An agency's findings of fact are considered *prima facie* true and correct, and we will reverse those findings only where they are against the manifest weight of the evidence. *Young-Gibson*, 2011 IL App (1st) 103804, ¶ 56. "We may affirm an agency's decision on any basis supported by the record." *Young-Gibson*, 2011 IL App (1st) 103804, ¶ 56.

¶ 16        It is uncontested that the District had a policy against violence in the workplace, and plaintiff was aware of that policy, having been issued a warning in May 2009 for violating that policy. On appeal, plaintiff rephrases his comment as "I don't want to make this an Arizona case" and asserts that his "Arizona" remark was not threatening. He concedes the comment may have been "ill-phrased and ill-timed," but asserts that he meant no more than that he did not want the situation to "turn into a federal case." However, the crux of the matter is more than interpretation of plaintiff's version of the remark but one of credibility, as the sworn testimony was conflicting as to what plaintiff actually said and whether it was interpreted as a threat.

¶ 17        Alvarez testified that after he took plaintiff into the office, plaintiff told the three supervisors present (Alvarez, Kiley, and Bruno) that he was going to "go Arizona" on them, and he pronounced the names of those three supervisors and a fourth supervisor. Alvarez took plaintiff's comment to mean plaintiff would "probably come and shoot" them and cause great bodily harm to them. When asked if he felt threatened, Alvarez responded that he did. Alvarez, Kiley and Bruno reported the incident to human resources, and the three men also filed a report with the police. Plaintiff's testimony differed significantly. He testified that after the incident with him and Frank, Alvarez pulled him over in front of the shop and repeatedly admonished him. Plaintiff testified he told Alvarez, "[Y]ou know ain't nobody trying to go Arizona." Alvarez asked plaintiff to come into the office where Alvarez repeated that plaintiff's comments to Frank were inappropriate. Bruno and Kiley were in the office. Plaintiff responded: "And I was like Art ain't nobody trying to go Arizona." Plaintiff explained to the referee that his comment meant for Alvarez to calm down. Pamela Walton testified that at a corrective action meeting after the incident, plaintiff told her that the remark he had made was, "No one's about to go Arizona."

¶ 18        Having heard the witnesses' testimony, the referee found that Alvarez was a credible witness and that plaintiff's version of the facts was not credible. Plaintiff argues, however, that the referee's factual determination was flawed because the District's own record showed

plaintiff's remark was not threatening. The "record" to which plaintiff refers was the District's disciplinary meeting disposition sent to plaintiff, advising him that his employment had been terminated. The document stated in pertinent part: "It has been reported that *** you were heard making the following allegation[,] 'I don't want this to turn into an Arizona thing', and directed the comment to each of the foremen present." On appeal, plaintiff refers only to the first part of the remark, "I don't want this to turn into an Arizona thing," contending that that statement contradicts Alvarez's version of plaintiff's remark to him, Bruno, and Kiley.

¶ 19        The referee rejected plaintiff's argument that the statement was innocuous and could not be deemed threatening. More than one interpretation of the statement is possible. Moreover, the second part of the statement which plaintiff ignores–"and directed the comment to each of the foremen present"–substantiated the testimony of Alvarez that plaintiff directed his remark to each of the three foremen present and a fourth foreman and that he referred to each of the four foremen by name. This corroboration of Alvarez's testimony refutes plaintiff's claim that the remark was intended only for Alvarez's ears, with the intent to calm Alvarez down.

¶ 20        Plaintiff also asserts that his "Arizona" remark was not a threat because he did not appear angry and he did not raise his voice when he made the remark. Alvarez testified that he did not know if plaintiff was angry or not. Alvarez also testified that plaintiff's voice was not raised, but added: "I've been threatened before with lower voices than that." Plaintiff also asserts that his remark should not be taken as a threat because there was no history of similar incidents between him and Alvarez. However, Alvarez testified that while he had not had previous confrontations with plaintiff, other supervisors had.

¶ 21        The District's policy forbade any comment creating a reasonable fear of injury to another person. Given that plaintiff's remark, referring to a violent fatal shooting incident that had occurred just weeks earlier, was directed individually to each of the foremen in plaintiff's presence, that Alvarez interpreted the remark as an intent by plaintiff to cause great bodily harm, and that the referee determined Alvarez was a credible witness, we cannot say that the conclusion of the referee and of the Board was against the manifest weight of the evidence, nor do we find clearly erroneous the Board's conclusion that the facts constituted misconduct.

¶ 22        Plaintiff also contends that the circuit court erred in striking the verified statement of Jack Bruno, which plaintiff attached to his petition for administrative review. In light of that statement, plaintiff asks this court to remand this case to take additional evidence pursuant to section 3-111(a)(7) of the Code of Civil Procedure (735 ILCS 5/3-111(a)(7) (West 2012)).

¶ 23        Judicial review of administrative decisions is restricted to the record compiled by the agency, and no new or additional evidence shall be heard by the circuit court. *Caliendo v. Martin*, 250 Ill. App. 3d 409, 419 (1993). The question of whether to remand a case to the administrative tribunal for the purpose of presenting new evidence is a matter of sound discretion of the circuit court. *Morelli v. Ward*, 315 Ill. App. 3d 492, 499 (2000) (citing *Caliendo*, 250 Ill. App. 3d at 419).

¶ 24        Bruno's statement averred that he never felt threatened by plaintiff's remark and did not believe plaintiff threatened anyone; that subsequently general foreman Jack Campesi wanted him, Alvarez and Kiley to say that plaintiff threatened them; and that Campesi and Kiley wanted to contact the police but he (Bruno) and Alvarez did not. The statement also averred that Bruno "was afraid to say anything in detail" before he retired from the District. Significantly, Bruno's statement did not describe what plaintiff actually said, did not deny that

plaintiff's remark warned that he would "do an Arizona," did not aver that plaintiff was merely saying that he did not want the situation "to turn into a federal case," and did not deny that plaintiff addressed his remark to each foreman present, referring to each by name.

¶ 25 In arguing that justice demands that this court remand this matter to the administrative agency, plaintiff relies on *Morelli*, 315 Ill. App. 3d at 499. Morelli, a deputy sheriff, was indicted on the charge of domestic battery of his girlfriend and, after an administrative hearing, was terminated from his employment. *Morelli*, 315 Ill. App. 3d at 494. At Morelli's subsequent trial, his girlfriend recanted her grand jury testimony and her complaint against him, and he was found not guilty of the criminal charge. *Morelli*, 315 Ill. App. 3d at 496. In his pending administrative appeal, the trial court denied Morelli's request for a remand to the administrative agency to supplement the record with evidence of his acquittal. *Morelli*, 315 Ill. App. 3d at 496-97. The appellate court reversed, holding that where Morelli's girlfriend remained the complaining witness against him, "it would be unjust to penalize Morelli for not seeking out the complaining witness to appear" before the agency. *Morelli*, 315 Ill. App. 3d at 499. *Morelli* is easily distinguishable, as only one complaining witness was involved and her recantation nullified the underlying incident that had resulted in the termination of his employment. Here, Bruno was not the only individual to whom the "Arizona" comment was directed.

¶ 26 Plaintiff argues that Bruno's statement "could not by the exercise of reasonable diligence have been obtained at the administrative hearing" in April 2011 because Bruno was, "for all intents and purposes," a member of the complaining party until his retirement from the District in July 2011. However, the underlying action was the denial of unemployment benefits and plaintiff was the complainant; the named respondent was his employer, the District, and Bruno was not a named party or a sworn witness against plaintiff. Plaintiff denies that Bruno was available to participate in the hearing, claiming that "Bruno was afraid to testify because he feared retaliation" by the District. Bruno said in his written statement: "I was afraid to say anything in detail before I retired, but now that I am retired, I do not fear any retaliation from" the District. Bruno's statement did not claim, however, that he ever had cause to fear, or received a threat of, retaliation.

¶ 27 We agree with defendants that plaintiff could or should have secured Bruno's participation in the April 2011 telephone hearing. It is clear from plaintiff's attempt at the April 2011 hearing to have the referee consider Bruno's written note that plaintiff knew Bruno's testimony would be favorable but failed to secure Bruno's appearance at the hearing. Weeks before the telephone hearing, in the notice of the hearing mailed to plaintiff, he was advised of the availability of the publication "Preparing for Your Appeal Hearing" which explained his right to request the hearing referee to subpoena witnesses. The publication also advised that each side was expected to have its witnesses and evidence available at the time of the hearing, and that once the hearing was closed nothing further could be added to the record. Plaintiff was also advised in writing on multiple occasions before the hearing of the availability of free legal assistance to claimants at the initial hearing level. Where plaintiff appeared at the initial hearing without securing the attendance of Bruno and chose to appear without benefit of counsel, he should not be allowed a second bite at the apple. See *Village Discount Outlet v. Department of Employment Security*, 384 Ill. App. 3d 522, 527 (2008). We conclude the circuit

court did not abuse its discretion in declining to remand this case to the administrative tribunal for the presentation of new evidence.

¶ 28 The Board's factual findings were not against the manifest weight of the evidence, and its conclusion that those facts constituted misconduct under the Act was not clearly erroneous. We also find that the trial court did not abuse its discretion under the facts of this case in refusing to remand this matter to the Board to hear additional evidence. Accordingly, we affirm the judgment of the circuit court and uphold the decision of the Board.

¶ 29 Affirmed.